UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
A.M. LUKAS,                                          :
                                                     :     Civil Action No.:
                Plaintiff,  :
                                                     :
        v.                                 :     **COMPLAINT**
                                                     :
NUNO LOPES, in his individual and professional       :
capacities,                                          :     **Jury Trial Demanded**
                                                     :
                Defendant.  :
---------------------------------------------------------------- X

Plaintiff A.M. Lukas ("Plaintiff" or "Lukas") by their counsel, Wigdor LLP, for their complaint against Nuno Lopes ("Mr. Lopes" or "Defendant") alleges as follows:

## PRELIMINARY STATEMENT

1. As an aspiring writer and filmmaker, A.M. Lukas was pleased by the invitation to attend the premiere party of an independent film at the Tribeca Film Festival. For Lukas, the event was a chance to meet others in the industry and become familiar with new work. Lukas never would have imagined that the night would end as it did: they rapidly lost consciousness and were raped by a fellow member of the film community.

2. At the premiere party on April 28, 2006, Lukas met Mr. Lopes, a Portuguese actor who, upon introduction, reached out his hand and touched Lukas's waist. As the night went on, Lukas remembered feeling their body become heavier than usual, despite only consuming a few glasses of wine. This was completely abnormal for them. Then Lukas started to lose their memory—another unusual and frightening experience for them.

3. What Lukas does remember from the remainder of that night and the ensuing morning hours returned to them in isolated flashes because Lukas's memory had become

1

fragmented. They remember Mr. Lopes kneeling in front of them in the morning light, holding their legs up as he thrust his penis into their body; they remember Mr. Lopes also thrusting his penis into them from behind; they remember Mr. Lopes saying, "This condom is killing me," as he peeled it off his flaccid penis; they remember Mr. Lopes masturbating over their naked, motionless body, presumably in an effort to become erect; and they remember trying to put their clothes on and Mr. Lopes taking them off. Finally, they remember Mr. Lopes calling them a cab in the early morning hours of April 29, 2006.

4. Lukas did not and could not have consented to having sex with Mr. Lopes. The following day, Lukas went to the hospital, the hospital performed a rape kit, and Lukas reported the rape to the police. Lukas's life had been forever changed.

5. Since he raped Lukas in 2006, Mr. Lopes has enjoyed rapid success—earning credits as an actor in fifty-two (52) productions[1] and winning five Golden Globes in Portugal.[2] In January 2023, Mr. Lopes was nominated for another Portuguese Golden Globe.[3] Presently, he is slated to star in two upcoming Portuguese TV series,[4] boasts 430,000 followers on Instagram[5] and has successfully expanded his "brand" by becoming a DJ.[6]

6. Meanwhile, Lukas has managed to maintain progress in their career as a critically lauded independent filmmaker only by battling through the challenges posed by the

---

[1] Nuno Mr. Lopes, IMDb, https://www.imdb.com/name/nm0519933/ (last visited Nov. 15, 2023).
[2] Nuno Mr. Lopes, IMDb Awards, https://www.imdb.com/name/nm0519933/awards/?ref_=nm_awd (last visited Nov. 15, 2023).
[3] Id.
[4] IMDb, supra note 1.
[5] @nunoMr. Lopes, Instagram, https://www.instagram.com/nunoMr. Lopes/ (last visited Nov. 15, 2023).
[6] Nuno Mr. Lopes, Match Attack, https://www.match-attack.com/en/artists/nuno-Mr. Lopes (last visited Nov. 15, 2023).

physiological repercussions of severe trauma while saddled with the arduous, protracted burden of accepting, processing, and healing the far-reaching psychological, emotional and spiritual damage caused by Mr. Lopes's rape. Lukas was diagnosed with Post-Traumatic Stress Disorder ("PTSD"), has suffered from a manic-depressive episode and has experienced suicidal ideation, all in connection with Mr. Lopes's rape. At one point, Lukas suffered symptoms so severe that they had to be cared for by their parents. Further, the impact of Mr. Lopes's rape of Lukas cost Lukas representation by a top Hollywood agency and management company, film projects they were developing and an $75,000 filmmaking grant.

7. For nearly two decades, Mr. Lopes has avoided liability for his rape of Lukas. Now—pursuant to the Adult Survivor's Act—Lukas seeks to hold him accountable.

## JURISDICTION AND VENUE

8. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is a diversity of citizenship among the parties and this action involves an amount in controversy in excess of $75,000, excluding interests and costs.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district.

## PARTIES

10. Plaintiff A.M. Lukas is a writer and filmmaker. Lukas is a citizen and resident of the State of New York.

11. Defendant Nuno Mr. Lopes is a film actor. Upon information and belief, Mr. Lopes is a citizen and resident of Portugal.

# FACTUAL ALLEGATIONS

## I. LUKAS'S BACKGROUND

12. Lukas is an award-winning writer and filmmaker, best known for their feature film, *Hollidaysburg*, and their Sundance-opening, Oscar-qualifying short film, *One Cambodian Family Please for My Pleasure*, which stars British actor Emily Mortimer, and has been embraced internationally by film festivals as well as by the United Nations Refugee Agency.

13. Working with VICE Studios, Lukas expanded *One Cambodian Family Please for My Pleasure* to create a series—*Grand Forks*—which sold to Showtime with Lukas set to write and direct.

14. Lukas starred in Starz's limited series, *The Chair*, which followed the making of Lukas's directorial debut, *Hollidaysburg*, a film that received an overwhelmingly positive critical response. The *LA Times* called it "smart, warm, and authentic—one of the better youth comedies of the last few years."

15. In addition, in 2015, Lukas won the inaugural "Through Her Lens" grant from the Tribeca Film Institute.

16. Lukas graduated with a degree in screenwriting from New York University's Tisch School of the Arts in 2004. After graduating, Lukas stayed in New York and aspired to be a writer and filmmaker, reading scripts for Focus Features and working for the filmmaker Wes Anderson.

## II. LUKAS IS RAPED BY MR. LOPES

17. On April 28, 2006, Lukas was invited by two female friends to dinner, followed by a party in the Meatpacking District of Manhattan to celebrate the premiere of *Journey to the*

*End of the Night* at the Tribeca Film Festival. The film starred an actor who knew one of Lukas's friends.

18. At dinner, Lukas had a white wine cocktail. At the premiere party, Lukas ordered a glass of white wine at the bar and sat on a bench talking with a friend. Another friend beckoned Lukas over to where Mr. Lopes and an actor from the film were talking. Lukas was then introduced to the actor and to Mr. Lopes.

19. Lukas asked where Mr. Lopes was from. He leaned in close, replied that he was from Portugal and, as he spoke, touched Lukas's waist with his hand.

20. The music was too loud to continue the conversation, so Lukas returned to the bench where Lukas continued to sip their wine.

21. For the first time that evening, Lukas started to feel "floaty" and eventually made their way to the lobby to use the restroom. Lukas then returned to the party, where they sat up on a banquette close to the bench where they had met Mr. Lopes earlier.

22. Later, Lukas's body started to feel heavier than usual. Lukas's previous responses to alcohol had never elicited this kind of reaction, and Lukas had never (and had not that night) drunk to the point of "blackout" or memory loss due to alcohol consumption.

23. Although Lukas had consumed only a few glasses of white wine that night, it was at this point in the evening that they started to lose their memory of what transpired.

24. At the premiere party, Lukas remembered watching a friend dance with her fiancé and then nothing of the next several hours.

25. Lukas's next memory was of a bright, white light followed by flashes of events bathed in that light, without certainty of the order in which they occurred.

26. One flash was a blurry image of Lukas's own legs and ankles appearing high above their face as they laid on a deflating air mattress while Mr. Lopes kneeled in front of Lukas, holding their legs up and thrusting his penis into Lukas.

27. In this memory and in the subsequent flashes, Lukas recalls almost no physical sensations or sensory awareness. Sometimes (as in the aforementioned flash) Lukas seemed half-conscious and without motor skills as Mr. Lopes maneuvered their limp body; sometimes Lukas seemed able to move on their own and verbalize, even within the confusion around where they were and who they were with; sometimes it was as though Lukas was outside their own body, watching Mr. Lopes violate them from an upper corner of the room.

28. Later, Lukas would come to recognize this experience as "depersonalization" or psychologically "leaving one's body"—a traumatic stress response closely associated with human-caused, intentional trauma, such as the loss of one's bodily integrity through rape.

29. In another flash, Lukas was on their knees unsteadily while Mr. Lopes thrust his penis into them from behind.

30. In another flash, Mr. Lopes said, "This condom is killing me," as he peeled it off his flaccid penis.

31. In another flash, Lukas lay the wrong way on the air mattress, the back of their head pressed against a wall, their calves and heels touching the hardwood floor, while Mr. Lopes masturbated over Lukas's naked, motionless body—presumably, to become erect.

32. Lukas also has a vague memory of trying to put on their clothes and of Mr. Lopes taking them off.

33. Lukas recalled that Mr. Lopes called them a cab around 7:30 a.m. on April 29th and gave them $30 to pay for it, along with his phone number.

### III. LUKAS SEEKS MEDICAL TREATMENT AND REPORTS THE RAPE TO THE POLICE

34. Lukas went home and slept, waking a few hours later to go to their job at a clothing store.

35. Lukas felt strange and found themselves intensely vacuuming the floor of the store in a daze as they tried to piece together what had happened to them the night before.

36. Lukas was confused and troubled by their inability to recall so much of the previous night and continued to have the same "floaty" dissociative feelings that they had experienced at the premiere party.

37. After working at the clothing store, Lukas worked a shift at a local bar but continued to feel dissociated from their body. Lukas took a cab home, still struggling to remember what happened the night before and feeling that something was not right.

38. While in the cab around 3:45 a.m., Lukas received a call from a number they did not recognize. The caller left a message that sounded as though a man was masturbating and moaning while calling Lukas's name into the phone. Lukas was disgusted and terrified by what they had heard.

39. After getting some sleep, Lukas met up with a female friend who had attended the premiere party.

40. As the two sat on a bench on the Brooklyn Promenade, Lukas's friend pressed them for details about what happened with Mr. Lopes, referring to the evening as a "one night stand."

41. Lukas suddenly bolted up, ran away, yelled "no, no," and started to bawl. When Lukas's friend caught up with them, Lukas confided in her that they could not remember how the sex with Mr. Lopes had started. At that moment, it hit Lukas that they could have been drugged.

42. That evening, after the shock and confusion wore off, Lukas Googled "what to do if think you have been drugged" which pulled a search result for Safe Horizon, a crime victim agency serving sexual assault survivors in New York City.

43. Lukas called the Safe Horizon hotline and was advised to go to the hospital.

44. Lukas went to the closest medical facility, Long Island College Hospital's Emergency Room ("ER"), where Lukas told the triage nurse that they suspected they had been drugged. The hospital performed a rape kit on Lukas. Shortly after, police officers arrived to speak with Lukas about the rape.

45. Next, an ER doctor presented Lukas with a choice: either take a recently approved cocktail of drugs that may stave off transmission of HIV, or do not, and hope that the sexual contact Mr. Lopes had made with Lukas had been protected. The doctor explained that the regimen of pills came with potentially significant side effects. Thus, an overwhelmed Lukas called Mr. Lopes from the hospital bed to tell him that they needed to know what had happened. Mr. Lopes confirmed that he had intercourse with Lukas and further confirmed that he had not used a condom for at least part of the encounter.

46. Given the latter, Lukas was treated prophylactically with drugs, including a month-long daily cocktail of anti-HIV pills, in order to prevent the possibility of pregnancy as well as any sexually transmitted diseases that they may have contracted.

47. On May 1, 2006, Lukas called Mr. Lopes and said that they were having a hard time because they remained unable to remember most of what had happened, not even when or how the sex had started. Lukas was desperate to learn what had transpired. In the hope that it would make Lukas feel better, Lukas proposed that they meet in person so that Mr. Lopes could explain himself.

48. Years later, Lukas understood that the meeting with Mr. Lopes was Lukas's attempt to normalize and neutralize a traumatic event: if Mr. Lopes agreed to meet Lukas in person, and it seemed as though his story was genuine, then Lukas could remain in denial of the rape.

49. The two met for coffee downtown, near a venue where Lukas had plans to see a concert with a friend.

50. Lukas told Mr. Lopes that they were worried they had been drugged on the night that Lukas had met him. He replied, incredulously, "Do people do that here in America? I've never heard of that."

51. Lukas then asked Mr. Lopes to take them through every minute of the night. Mr. Lopes claimed that after they had met at the premiere party, he and Lukas had flirted and kissed before taking a cab to his apartment. He said that upon entering the apartment, Lukas had gone into the bathroom and closed the door, and that soon after Mr. Lopes had found Lukas lying unconscious on the floor.

52. Mr. Lopes claimed that he and his roommate had dragged Lukas's body from the bathroom to his bedroom and onto an air mattress, while he had slept on his living room couch in order to "give Lukas space." He also claimed that when he had come to check on Lukas the next morning, Lukas had started kissing him and had wanted to have sex. Mr. Lopes asserted that after they had sex, Lukas started to get dressed to leave but Mr. Lopes had had sex with them again before putting Lukas into a cab home.

53. Lukas asked Mr. Lopes to listen to the disturbing voicemail they had received, thinking that perhaps it had been left by Mr. Lopes's roommate, whom Lukas feared might have also had sex with Lukas's unconscious body during the period for which they had no memory.

9

Mr. Lopes said that he had not left the message, and denied recognizing the voice, but appeared to stifle a gleeful expression, as though he had found the lewd message to be funny.

54. The following day, Lukas went to their job as a fit model at Urban Outfitters and cried the entire day.

55. On May 3, 2006, Lukas took the day off from Urban Outfitters to meet with a rape crisis counselor and an HIV nurse. Because the anti-HIV medication was causing them extreme nausea and intestinal issues, Lukas was forced to call in sick the next day. When they returned to work at Urban Outfitters on May 5, 2006, Lukas was fired for missing the previous two days.

56. Lukas filed for and subsequently received short term disability payments for the work that they had missed due to the side effects of the HIV drugs, explaining on their application forms that their disability was "extreme nausea and abdominal pain caused from preventative HIV medication I had to take after being raped."

57. Lukas also applied to the New York State Crime Victims Board for reimbursement for counseling that they had received in the immediate wake of the rape.

## IV. LUKAS HAS SUFFERED LIFE-LONG EFFECTS FROM MR. LOPES'S RAPE

58. Shortly after the rape, Lukas sought counseling in New York in order to process the trauma and worked with one therapist for several years. Lukas's therapist referred them to a psychiatrist who diagnosed Lukas with PTSD stemming from the rape.

59. In the spring of 2015, after an extended break from therapy, Lukas started treatment again with a different therapist, this time in Los Angeles. During their work with this therapist, Lukas was able, for the first time, to fully confront the horror of being drugged and raped by Mr. Lopes. The flood of traumatic memories that followed brought on a manic-

depressive episode—the first and last Lukas has ever experienced—which led to the dissolution of their marriage, ostracization from a large circle of friends and colleagues and a major stall in their promising film career.

60. During this period, Lukas suffered symptoms so severe that their social and professional life stopped entirely, and they had to be cared for by their parents.

61. Acutely suicidal, Lukas was unable to write or pursue the film projects they had been developing. Lukas lost their representation at a top-tier Hollywood agency and management company, and was forced to forfeit a $75,000 filmmaking grant, which they had been awarded by the Tribeca Film Institute.

62. Ultimately, Lukas was given a diagnosis of bipolar disorder, which their doctors agree was precipitated by a confrontation with the unprocessed trauma of the rape. Lukas still has nightmares about the events from that period of time.

63. To this day, Lukas's PTSD symptoms are triggered by seeing references to Mr. Lopes—including recent, unexpected sightings of Mr. Lopes on a billboard promoting his film in Paris and in a trailer for a Netflix show called *White Lines*, in which he appeared. Some other triggers include white wine, certain sexual positions, or being in the area of Manhattan where the premiere party took place.

64. Lukas's PTSD symptoms include difficulty leaving their apartment, avoidance of social situations, panic attacks, trembling, uncontrollable crying, an exaggerated startle response, nightmares, intrusive thoughts, flashbacks and a debilitating hypersensitivity to sound. Once triggered, some of these symptoms can last for weeks or months at a time.

65. The trauma of the rape has also profoundly impacted Lukas's relationships, both platonic and sexual. Lukas has contended with an abiding fear, discomfort and suspicion of men.

This has challenged Lukas's ability to build trusting relationships with men in realms both personal and professional. Additionally, Lukas must manage the possibility of rape flashbacks, dissociation, depersonalization, and panic attacks during sexual contact with others.

66. Lukas has also revisited the subject of rape repeatedly in their work as a writer in an attempt to process the trauma. It is not an exaggeration to say that Mr. Lopes's rape of Lukas has infiltrated every aspect of Lukas's work and life.

67. Lukas now seeks to hold Mr. Lopes liable for the rape he committed.

### CAUSE OF ACTION
### (Battery/Sexual Battery)
*Against Defendant Mr. Lopes*

68. Plaintiff repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

69. As described above, Defendant Mr. Lopes forcibly sexually assaulted Plaintiff without their consent and against their will, committing sexual battery against Plaintiff because he intentionally engaged in unlawful, intentional and offensive touching or application of force to Plaintiff's person.

70. Defendant Mr. Lopes forcibly touched Plaintiff's intimate areas and/or touched them with his own intimate body parts, including invasively penetrating their vagina.

71. As a direct and proximate result of Defendant Mr. Lopes's conduct, Plaintiff has suffered, and continues to suffer, physical injury, severe emotional distress, humiliation, anxiety and other consequential damages for which Plaintiff is entitled to an award of monetary damages and other relief.

72. The conduct of Defendant Mr. Lopes described above was willful, wanton and malicious. At all relevant times, Defendant Mr. Lopes acted with conscious disregard for

Plaintiff's rights, welfare and consent, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury and/or pain and suffering to Plaintiff. By virtue of the forgoing, Plaintiff is entitled to recover punitive damages.

73. This cause of action is timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j (McKinney 2022), because it arises out of conduct perpetrated against Plaintiff, who was eighteen years of age or older at the time of the conduct, which constitutes a sexual offenses as defined Article 130 of the New York Penal Law ("Article 130").

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in their favor and against Defendant, containing the following relief:

A. An award of damages against Defendant to compensate Plaintiff for all monetary and/or non-monetary and/or compensatory harm, including, but not limited to, compensation for mental anguish and physical injuries;

B. An award of punitive damages;

C. An award of attorneys' fees and costs that Plaintiff has incurred in this action;

D. Prejudgment and post-judgment interest on all amounts due; and

E. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: November 17, 2023
      New York, New York

**WIGDOR LLP**

By: _____
      Michael J. Willemin

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com

*Attorney for Plaintiff*